UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>CHRISTOPHER STEVENS,<br>    *Defendant*. | No. 3:17-cr-00008 (JAM) |

**ORDER REJECTING GUILTY PLEA FOR
FAILURE TO RESPECT THE CRIME VICTIM'S FAMILY**

This case involves the prosecution of a young man who distributed heroin that was lethally laced with fentanyl. The victim overdosed and died. The Government entered into a plea agreement with terms that were highly favorable to the defendant without first consulting about the agreement with the victim's surviving family. I will reject the plea agreement on the ground that the Government has not respected the rights and interests of the victim's family.

**BACKGROUND**

On the night of June 3, 2016, defendant Christopher Stevens arranged by text message to distribute heroin to a man in East Lyme, Connecticut. Shortly after 1:00 a.m., local police responded to a report of a car parked with its engine running just a short distance from the man's home. Inside the car police found the man and his 3-year-old son. The man was dead in the driver's seat from an overdose of heroin that had been laced with fentanyl. His 3-year-old child was fortunately unharmed.

Law enforcement authorities later tracked the defendant down through the text messages found on the victim's phone. The defendant was arrested in July 2016, and he appeared before me more than six months later for the purpose of waiving indictment and entering a plea of guilty to a charge of distribution of heroin, in violation of 21 U.S.C. § 841(a)(1) and § 841(b)(1)(C).

1

At the guilty plea hearing there were no members of the victim's family present. When I inquired if the family had received notice and if they had any objection to the terms of the plea, the prosecutor seemed uncertain, explaining that he had recently assumed responsibility for this case from another prosecutor but that he believed the victim's family had received notification about the plea hearing from the victim-witness coordinator at the U.S. Attorney's Office.

I asked the prosecutor: "Are they [the family] okay with the essential terms of the plea agreement, as far as you know? Any objections or concerns?" The prosecutor replied:

> Not that I'm aware of, Your Honor. Nothing has been brought to my attention, at least at this juncture. Again, unfortunately, I did not necessarily speak, but again, our victim liaison people in our officer did not apprise me of any issues.

I asked the prosecutor whether he had personally spoken with the victim's family, and he stated that he was "kind of new to this case" and that "I personally have not spoken with the family, but through our office victim liaison as well as with the [DEA] agent, the family is apprised of the nature of proceedings and that today was scheduled for the change of plea."

Although I proceeded with the plea hearing, I made clear that I would not accept the plea of guilty until learning more about what the victim's family's views were with respect to this plea. I entered an order requesting the prosecution to "file a statement describing how it has complied with its obligations under 18 U.S.C. § 3771 [the Crime Victims' Rights Act] and whether the victim's family and/or estate concurs with the proposed terms of the plea agreement." Doc. #46.

The Government soon filed a statement recounting that the parties had "reached and finalized a plea agreement" at some point during the week of January 9, 2017, that the Government contacted the Clerk's office on January 13, 2017, to request assignment of the case

to a judge, and that the Court thereafter scheduled the plea hearing for January 18, 2017. Doc. #47 at 1.

The Government's statement went on to describe the following concerning contacts with the mother of the victim—and most significantly disclosing for the first time that the victim's family did not agree with the terms of the plea:

> Due to the short period of time elapsing from this assignment and the scheduled date which included an overlap with the Martin Luther King holiday, the Victim Witness Coordinator for the United States Attorney's Office, who had previously been in contact with the mother of the victim in this case during the post-arrest pendency of this matter, immediately contacted the mother by telephone to advise her that a plea proceeding had been scheduled. The Coordinator advised the mother of the date and time of the hearing and offered to meet with her to discuss the expected proceedings. *When the mother was advised that the expected plea was to a charge of distribution of heroin, the mother expressed dissatisfaction that the death of her son was not charged.* She further advised the Coordinator that she did not expect to attend the scheduled plea hearing, but that she might consider attending and speaking at the sentencing hearing.

Doc. #47 at 2 (emphasis added).

According to the Government's statement, the coordinator later contacted the victim's mother after the plea hearing to advise her of the sentencing date and offered to meet with her. The victim's mother declined to meet, stating that "the renewal of this case signified by the entry of the plea was extremely painful to her" but that "she might decide to meet at a later date." *Ibid.* The Government further stated it would continue to notify the victim's mother of any future court proceedings and "hope[s] to meet with the victim's mother to obtain a Victim Impact Statement prior to sentencing." *Id.* at 2–3.

## DISCUSSION

Victims of crime have long had an uncertain role in the criminal justice process. Some centuries ago, victims *were* the criminal justice process—if a victim was criminally wronged, it fell upon the victim to mount a private prosecution for punishment and restitution. Times

changed. By the Enlightenment era, crimes were conceptually re-conceived as public wrongs to be subject to public prosecution. Victims could not necessarily be trusted to prosecute public wrongs, and victims were relegated to pursuing civil tort remedies while trusting that the state would do justice for the criminal wrongs they suffered. Over the years, as the state acquired a monopoly over a professionalized public prosecution process, victims were increasingly marginalized without a clearly defined role.[1]

By the 1980s, the pendulum began to swing back again in favor of victims, particularly as victims organized and reasserted themselves through a victims' rights movement. This in turn led to a groundswell of reforms at both the state and federal levels to confer formal protections or "rights" for victims.[2]

In 2004, Congress consolidated and strengthened prior reform laws by means of enacting the Crime Victims' Rights Act (CVRA), 18 U.S.C. § 3771. The CVRA stemmed from a concern in part that "prosecutors and law enforcement officers too often ignored or too easily dismissed the legitimate interests of crime victims." *United States v. Turner*, 367 F. Supp. 2d 319, 322 (E.D.N.Y. 2005). The legislative history of the CVRA confirms that "[v]ictims of crime often do not feel their voices are heard or that their concerns are adequately addressed in the judicial process," and that "[m]any express frustration with a judicial system that affords many rights to the accused while giving few to the victim." H.R. Rep. 108-77 at 3, 2005 U.S.C.C.A.N. 2274, 2276 (Sept. 30, 2004).

---

[1] *See generally* Danielle Levine, *Public Wrongs and Private Rights: Limiting the Victim's Role in a System of Public Prosecution*, 104 Nw. U.L. Rev. 335, 337–39 (2010); Douglas E. Beloof, Paul G. Cassell & Steven J. Twist, VICTIMS IN CRIMINAL PROCEDURE 3–11 (Carolina Acad. Press 2005).

[2] *See* Paul G. Cassell, *The Victims' Rights Amendment: A Sympathetic, Clause-by-Clause Analysis*, 5 Phoenix L. Rev. 301, 303–09 (2012) (describing movement and history of statutory reforms).

In order to recognize the interests of victims in the criminal justice process, the CVRA enumerates ten basic "rights" for the victim of a federal crime:

(1) The right to be reasonably protected from the accused.

(2) The right to reasonable, accurate, and timely notice of any public court proceeding, or any parole proceeding, involving the crime or of any release or escape of the accused.

(3) The right not to be excluded from any such public court proceeding, unless the court, after receiving clear and convincing evidence, determines that testimony by the victim would be materially altered if the victim heard other testimony at that proceeding.

(4) The right to be reasonably heard at any public proceeding in the district court involving release, plea, sentencing, or any parole proceeding.

(5) The reasonable right to confer with the attorney for the Government in the case.

(6) The right to full and timely restitution as provided in law.

(7) The right to proceedings free from unreasonable delay.

(8) The right to be treated with fairness and with respect for the victim's dignity and privacy.

(9) The right to be informed in a timely manner of any plea bargain or deferred prosecution agreement.

(10) The right to be informed of the rights under this section and the services [provided by law].

18 U.S.C. § 3771(a).

Importantly, the CVRA imposes no less than an *affirmative* obligation on judges to ensure that the victim's rights are respected: "In any court proceeding involving an offense against a crime victim, the court shall ensure that the crime victim is afforded the rights" as listed above. 18 U.S.C. § 3771(b). For the many guilty pleas and sentencings that are scheduled before me, I inquire of the Government at the outset of the proceedings whether and how it has respected the rights and interests of the victims.

An additional way that a court may respect the rights of victims is by declining to accept a guilty plea if the Government has chosen not to honor those rights in the first instance. A district court has broad discretion to reject a plea agreement in the interests of the "sound administration of justice." *See United States v. Severino*, 800 F.2d 42, 46 (2d Cir. 1986). The sound administration of justice requires not only respect for the rights and interests of criminal defendants but also respect for the rights and interests of crime victims.

That brings me to this case. As I understand the Government's submission, the prosecution did not consult with the victim's mother or family about the anticipated terms of the plea agreement before entering into the agreement with the defendant. The victim's mother learned about the plea agreement only after the fact from a victim-witness coordinator at the U.S. Attorney's Office. The victim's mother was upset that the Government decided to pursue a charge of heroin distribution but without including a charge for the death of her son.

I was told at the plea hearing that the victim's family had not objected to the plea, when in fact the victim's mother did object in her conversation with the victim witness coordinator. Did the coordinator fail to tell the prosecutor? Or did she tell the prosecutor, and this did not register with the prosecutor at the time of the plea hearing? I do not know. Either scenario suggests something less than the full attention to the views and concerns of a victim's family that the family deserved.

In any event, just as the victim's mother surmised, the Government could indeed have charged the defendant with a more serious crime of distributing narcotics that resulted in someone's death. *See* 21 U.S.C. § 841(b)(1)(C); *Burrage v. United States*, 134 S. Ct. 881 (2014). Rather than charge the most serious readily provable offense, the Government agreed after negotiations with defense counsel to file a far less serious charge for simple distribution of a

6

small amount of heroin—a charge that by its elements takes no account of the fact that the distribution of narcotics in this case resulted in the death of a victim.[3]

Now the Government may have strong reasons for electing not to pursue the most serious of charges. For one thing, the more serious charge carries a mandatory minimum 20-year prison sentence. A reasonable prosecutor could well conclude that such a severe sentence is not warranted in the absence of evidence that the defendant intended or wanted to kill the victim, or for any other mitigating reason.

But that is not the issue at this point. The question for now is did the Government have a good or defensible reason for not speaking with the victim's family about its intentions *prior* to sealing a plea deal with the defendant? I do not think so.

For many years the United States Attorney's Office in Connecticut has had a victim-witness coordinator. The professionals who have served in that role are very dedicated and caring people who strive to do their job well. But they are not the prosecutor. They are not the decisionmaker.

The CVRA does not contemplate that prosecutors will outsource all "victim" communications to coordinators or other administrative personnel. To the contrary, among the rights guaranteed to victims by the CVRA is the "reasonable right to confer with the attorney for the Government in the case." 18 U.S.C. § 3771(a)(5).

---

[3] True enough, the parties have calculated a Sentencing Guidelines range of between 21-27 months of imprisonment, and that calculation includes an enhancement due to the death of the victim. Doc. #42 at 3 (parties' agreement that Guidelines sentencing level should be increased "because a death resulted from the offense"). But both sides remain free to seek departures from that range. If I were to accept their plea deal, I would not be required at sentencing to impose a single day of imprisonment. There is an enormous gap between the charge and consequences that the Government could have pursued in this case and the charge and consequences that the Government actually pursued without consulting with the victim.

Just what does this right to confer mean? Surely it must mean more than that a prosecutor need only answer phone calls or emails if a traumatized victim has the verve to initiate a conversation with the prosecutor about the case. Instead, the right to confer with the prosecutor should be read in light of one of the CVRA's primary purposes: to give victims a meaningful voice in the prosecution process. In my view, the CVRA's right to confer with the prosecutor requires at the least that a prosecutor take reasonable steps to consult with a victim before making a prosecution decision that a prosecutor should reasonably know will compromise the wishes and interests of the victim.

Other courts agree. The Fifth Circuit has concluded that "in passing the [CVRA], Congress made the policy decision—which we are bound to enforce—that the victims have a right to inform the plea negotiation process by conferring with prosecutors before a plea agreement is reached." *In re Dean*, 527 F.3d 391, 395 (5th Cir. 2008) (*per curiam*); *see also Jordan v. Dep't of Justice*, 173 F. Supp. 3d 44, 51 (S.D.N.Y. 2016) (describing scope of the reasonable-right-to-confer-with-prosecutor under the CVRA); *Doe v. United States*, 950 F. Supp. 2d 1262, 1267 (S.D. Fla. 2013) ("the court concludes that the 'reasonable right to confer . . . in the case' guaranteed by the CVRA at § 3771(a)(5) is properly read to extend to the pre-charge stage of criminal investigations and proceedings, certainly where—as here—the relevant prosecuting authority has formally accepted a case for prosecution").[4]

The Department of Justice also agrees. Its guidelines instruct prosecutors to consult with victims if feasible *before* they seal plea deals with criminal defendants. "Prosecutors should make reasonable efforts to notify identified victims of, and consider victims' views about,

---

[4] Although the Second Circuit has ruled that the CVRA does not require "the Government to seek approval from crime victims before negotiating or entering into a settlement agreement," *In re W.R. Huff Asset Management Co., LLC*, 409 F.3d 555, 564 (2d Cir. 2005), it has not addressed whether the CVRA requires consultation (as distinct from approval) in some circumstances.

prospective plea negotiations. Prosecutors should make these reasonable efforts with a goal of providing victims with a meaningful opportunity to offer their views before a plea agreement is formally reached." U.S. Department of Justice, *Attorney General Guidelines for Victim and Witness Assistance* 41 (2012), *available at* https://www.justice.gov/sites/default/files/olp/docs/ag_guidelines2012.pdf; *see also* ABA Standards of Criminal Justice, Pleas of Guilty, Standard 14-3.1(e) – Responsibilities of the Prosecuting Attorney ("The prosecuting attorney should make every effort to remain advised of the attitudes and sentiments of victims and law enforcement officials before reaching a plea agreement."); Elliot Smith, *Comment: Is There A Pre-Charge Conferral Right in the CVRA?*, 2010 U. Chi. Legal F. 407 (2010) (arguing that the CVRA requires the prosecutor to consult with the victim prior to a plea agreement and regardless whether charges have already been filed).

There are many reasons why victims should have a voice before the prosecutor offers a plea agreement to a criminal defendant. "The fact that they are consulted and listened to provides them with respect and an acknowledgement that they are the harmed individual," and "this in turn may contribute to the psychological healing of the victim." Douglas E. Beloof, Paul G. Cassell & Steven J. Twist, VICTIMS IN CRIMINAL PROCEDURE 478 (Carolina Acad. Press 2005). In addition, as a practical matter, "the victim may have financial interests in the form of restitution . . . which needs to be discussed with the prosecutor" in order to be accounted for in a plea agreement. *Ibid.*

The victim's personal views may (or should) be important to the prosecutor in deciding what is a just resolution of the case by means of a guilty plea. This is not to say that the victim is the prosecutor's principal or "client," much less to say that the prosecutor must agree with or adopt the victim's views. After all, we have our system of public prosecution in large part

because we long ago realized the shortcoming of private prosecutions: that "private justice is either too ineffective, or, conversely, *too* effective—it gives rise to feuds and leads to wholesale bloodshed," and "public prosecution is supposed to do away with private vengeance." Lawrence M. Friedman, A HISTORY OF AMERICAN LAW 217–18 (3d ed. 2005). Although the victim has no veto over the prosecutor's choices, the choices that a prosecutor makes will be better informed if the prosecutor learns and tries to understand the perspective of the person most deeply affected by a crime.

Often enough, victims may urge the prosecutor to deal severely with defendants who have hurt them. Some victims, however, may urge leniency for reasons of mercy, compassion, or forgiveness. Whatever the views that a victim may have, the integrity of a criminal prosecution is stronger if the prosecutor learns about these views if possible before making major decisions in a case.[5]

Prosecutors may also have important information for victims to know. Victims are not criminal justice professionals. They may automatically expect the prosecutor to "throw the book" at the defendant and seek the maximum sentence allowed by law. A prosecutor who speaks with the victim may moderate these expectations by explaining what is the customary sentence for the crime in question as well as explaining any mitigating facts that the prosecutor may have learned about the defendant and that the victim may not know.

If a dialogue between the prosecutor and a victim takes place (if at all) only after a plea agreement has been reached, the public will understandably have less confidence that a plea bargain is a just and fair resolution. And the victim will understandably have less confidence that

---

[5] Of course, there may be instances when a traumatized victim chooses not to engage with the prosecution. In such instances and where the victim's testimony is not necessary to the prosecution, the CVRA does not contemplate that prosecutors will compel the victim to engage or take part in the prosecution.

his or her feelings and views have been heard and respected. *See* Michael M. O'Hear, *Plea Bargaining and Victims: From Consultation to Guidelines*, 91 Marq. L. Rev. 323, 326–31 (2007) (summarizing "procedural justice" benefits that accrue when prosecutors consult with victims in connection with the plea bargaining process); *see also* Bennett L. Gershman, *Prosecutorial Ethics and Victims' Rights: The Prosecutor's Duty of Neutrality*, 9 Lewis & Clark L. Rev. 559, 572–76 (2005) (discussing ethical concerns that may arise if prosecutors do not exercise judgment independent of victims).

All that said, I do not understand the CVRA to impose a categorical requirement that in every case a prosecutor personally contact and consult with every victim prior to entering into a plea agreement. There may be instances of urgency or investigative secrecy when it is not practically feasible or advisable for a prosecutor to consult with the victim in advance. And the need for pre-plea consultation diminishes if the prosecutor pursues a plea agreement that does not compromise the expected views and interests of the victim—for example, if the plea agreement involves a charge to the most serious readily provable offense and fully protects the victim's right to restitution.

But that is not what happened here. A mother has lost her son forever. And the prosecution agreed to settle for a lesser charge without first consulting with the mother. Even when she was consulted, she learned of the terms of the plea deal only after the fact as a *fait accompli* from an administrative coordinator at the U.S. Attorney's Office. The mother's and the family's rights and interests were not appropriately honored and respected.

A 3-year-old boy now has no father. Who will care for him financially? The plea agreement here potentially shortchanges the victim's family's right to restitution, contrary to the explicit right of victims under the CVRA to full and timely restitution. *See* 18 U.S.C.

§ 3771(a)(6). The plea agreement provides in part for restitution including the payment of funeral expenses but without mentioning the potential for payment of future lost income. Doc. #42 at 2, 9. Future lost income is a proper component of restitution for cases in which a victim's death has resulted. *See United States v. Messina*, 806 F.3d 55, 67–71 (2d Cir. 2015).[6]

So why was there nothing in the plea agreement and nothing said at the guilty plea hearing about potential restitution for the victim's lost future income? I do not know. What I do know is that the prosecution did not consult with the family in the first instance to learn about the financial hardships that may result from the victim's death and to discuss the possible scope of a restitution order and how a restitution order could help meet the future financial needs of a fatherless 3-year-old boy. The Government acted contrary to the obvious interests of the victim's family and contrary to the Court's local rules which provide in part that "[t]he attorney for the government shall state on the record at any change of plea or sentencing proceeding the government's understanding of the amount of possible restitution based upon consultation with, *inter alia*, the victim." D. Conn. L. Crim. R. 32(m).

Victims do not know the ins-and-outs of the restitution statutes. Prosecutors should. The Government's pre-plea consultation with a victim's family should include advising the family of a possible restitution claim, to ascertain whether the family wishes the Government to pursue such restitution at sentencing, and to make clear to a defendant at the time of a plea agreement what the possible and likely scope of restitution may be.[7]

---

[6] Although the Second Circuit in *Messina* interpreted the language of the Mandatory Victims Restitution Act, 18 U.S.C. § 3663A(b)(2)(C), the same language appears in the statute that appears to govern restitution in this case, the Victim and Witness Protection Act, 18 U.S.C. § 3663(b)(2)(C).

[7] The plea agreement here provides that restitution may be ordered to the extent allowed by the restitution statute, but if the Court were at this time to enter an order of restitution for the victim's lost future income, the defendant may have a strong argument that he was misled by the plea agreement and colloquy during the plea hearing about the scope of potential restitution he faced, because of the restitution rider's inclusion only of restitution for funeral expenses and not for future lost income (which of course could potentially be far larger than costs for a funeral). Indeed, recently when I raised an identical concern shortly before a plea hearing in a similar

Is it too much to ask of prosecutors that they personally consult with crime victims? I do not think so. After all, most crimes charged by federal prosecutors are regulatory violations that do not have identified victims. *See* U.S. Sentencing Commission, 2015 SOURCEBOOK OF FEDERAL SENTENCING STATISTICS, Figure A – Offenders in Each Primary Offense Category, *available at* http://www.ussc.gov/research/sourcebook-2015. For the fraction of federal criminal prosecutions that have identified victims, there is no good reason to suppose that prosecutors cannot consult with those victims before they conclude plea agreements. That is especially true if a prosecutor is thinking of offering a defendant a plea agreement that falls short of what a victim might reasonably expect the prosecutor to pursue on the victim's behalf.

A prosecutor in another case once appeared before me for the sentencing of a bank robbery case. That prosecutor had written a sentencing memorandum invoking the terrified feeling that the bank tellers felt when the defendant waved around a firearm and demanded money. But no tellers or victims were in court. And no victim impact statements had been submitted. The prosecutor did not know why the victims were not there and why they had not been heard from. When I asked the prosecutor if he or she had personally spoken with the terrified victims, the prosecutor said no. The prosecutor claimed not to be aware that prosecutors should personally communicate with victims.

If a prosecutor walks into a courtroom and realizes that he or she has never personally spoken or corresponded with the crime's victim, then that should be a sign that the victim's interests have probably not been fully served and respected. That should be a sign that other interests have likely eclipsed the interests of the real people who have been harmed and whose only real recourse is the prosecutor who has slighted or overlooked them. Prosecutors are busy.

---

case involving a drug overdose death, the putative defendant decided not to go forward at that time with his anticipated guilty plea.

But it is hard to imagine what priorities should rank higher in a prosecutor's workday than to make sure that each victim of a crime is appropriately and lawfully respected.

## CONCLUSION

The Government did not respect the rights and interests of the victim's family before entering into the plea agreement in this case. Because the sound administration of justice does not support acceptance of a plea agreement when the Government does not respect the rights of crime victims, the Court rejects the parties' plea agreement.[8]

If the parties wish to renew guilty plea proceedings, they may schedule a new plea hearing and submit a new plea agreement. If the parties do so, the Government is requested to file a memorandum with the new proposed plea agreement addressing whether it has now fully consulted with the victim's family prior to committing to an agreement (or whether it has been impossible to do so) and whether the agreement otherwise appropriately protects the restitution interests of the victim's family.

It is so ordered.

Dated at New Haven, Connecticut, this 6th day of March 2017.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge

---

[8] Although I have concluded that there was a legal violation of the CVRA in this case, even if I am mistaken about the broad scope of the CVRA's reasonable-right-to-confer provision, I would still exercise my discretion to decline to accept the guilty plea in this case for the multiple additional reasons described in this ruling. In addition, notwithstanding my view that the Government did not appropriately respect the right of the victim's family in this case, the prosecutor in this case is a dedicated public servant, and nothing in this ruling should be understood as a conclusion that the prosecutor acted in bad faith or engaged in any kind of ethical misconduct.